HARRY N. WESSEL, Plaintiff, *v.* CROSSE & BLACKWELL, LIMITED, Defendant.*

Municipal Court of New York, Borough of Manhattan, Third District, July 26, 1934.

---

* Affd., App. Term, 1st Dept. Dec. 6, 1934. See, also, *Biel* v. *Crosse & Blackwell, Ltd.* (147 Misc. 718).

*Louis H. Robinson* [*A. Alexander Katz* of counsel], for the plaintiff.

*Auchincloss & Duncan* [*J. Donald Duncan* of counsel], for the defendant.

WHALEN, J.   Plaintiff is the owner of fifty shares of preference stock of Crosse & Blackwell, Inc., a former Maryland corporation (hereinafter referred to as the Maryland Company).   Indorsed on the face of his certificate of stock is a written guaranty executed on behalf of Crosse & Blackwell, Limited, a British corporation and the defendant herein (hereinafter referred to as the English Company).   The guaranty is as follows:

" Crosse & Blackwell, Limited, a British corporation, has unconditionally guaranteed, by agreement with Crosse & Blackwell, Inc., dated as of June 1, 1928, and hereby unconditionally guarantees, the payment of dividends on the stock represented by this certificate, from June 1, 1928, until the date upon which the dividend requirement of the Preference Stock then outstanding shall have been earned twice by Crosse & Blackwell, Inc., in each of two consecutive years ending June 30, and by acceptance of this Certificate the record holder of the stock represented by this Certificate shall become entitled to the benefits and subject to the provisions of said Agreement."

The guaranty is very strong.   It is "unconditional."   By reference, the agreement of guaranty between the two companies becomes incorporated therein.   A copy of the original agreement is annexed to the complaint and admitted by the answer.   A reading of the agreement makes the guaranty even stronger.   It provides for payment of the dividend punctually by the defendant without any notice or demand, and without proof of any other fact than the failure of the Maryland Company to pay on the due date.

The relationship between the two companies was very close. In the agreement the English Company is referred to as the " Parent Company " and the " Maryland Company " is referred to as the " New Company."   The Maryland Company was organized in the pleasant days of 1928 to manufacture and sell the same product

as the English Company, jams, jellies, etc., under the same name and brands and using the same manufacturing formulas. The managing director of the English Company corresponding to the president of an American corporation became a director of the Maryland Company.

There was some discussion at the trial as to whether or not the Maryland Company was a subsidiary of the English Company. The English Company owned sixty per cent of the common stock of the Maryland Company. Perhaps it could be called a branch company.

Apparently dividends were paid by the Maryland Company on the preference stock until 1931 when the defendant was called upon to make good on its guaranty and did so to the extent of about $176,000.

Plaintiff's preference stock was entitled to the dividends at the rate of $3.50 per annum, which have not been paid for the quarterly dividend dates of September 1 and December 1, 1932, and March 1 and June 1, 1933, amounting in all to $175. It is for that sum this suit is brought.

The defense is that on June 24, 1932, prior to the first dividend date stated above, the existence of the Maryland Company was duly and legally terminated by reason of the fact that on that date it entered into an agreement of consolidation with another Maryland corporation called the Eastern Company, the effect of which was to extinguish the two consolidating corporations and to give rise to a new consolidated corporation called the Crosse & Blackwell Company (hereinafter referred to as the Consolidated Company).

Defendant contends that the contract of guaranty contemplated the continued existence of the corporation whose dividends were guaranteed, and that the death of the corporation also brings to an end the contract of guaranty. It seems to be clear and it is not disputed that under the Maryland law the legal effect of the consolidation was to terminate the existence of each of the consolidating corporations as legal entities.

In reply to this plaintiff claims that the plan of consolidation was initiated, nurtured and carried to fruition, if not solely by the English Company, at least with its active participation, in had faith and for the purpose of relieving itself of the guaranty liability and that defendant is, therefore, estopped from asserting as a defense to plaintiff's claim the destruction of the Maryland Company.

The facts are undisputed in the sense of there being no contradictory testimony and the problem is to decide what inferences should be drawn from these uncontradicted facts.

After its incorporation the Maryland Company invested $1,200,-000 in the organization of a corporation in Canada to conduct a similar business known as Crosse & Blackwell (Canada) Limited, (hereinafter called the Canadian Company). The Maryland Company earned operating profits each year; in 1929, $163,000; in 1930, $173,000; in 1931, $70,000. The Canadian Company, however, never made any profits and was a drain on and a source of worry to the two other companies. In 1932 the Maryland Company had written down its investment in the Canadian Company to $300,-536.27. The depression had come along, the English Company was called upon to furnish $176,000 for dividends in 1931 and would be required to pay $240,000 for the same purpose in 1932 with the prospect of a continuation of such a state of affairs. In all probability in the boom days of 1928 in this country the English Company anticipated that it would never be called on to pay any dividends for the Maryland Company.

Under these circumstances the responsible persons in control of the English and the Maryland Companies began to discuss what could be done. The first definite written evidence that appears is a cablegram from Mr. Duncan in New York to Mr. Goff, the managing director, in London. It is dated December 23, 1931, and reads in full as follows: " Have had nice meetings with Menzies last week and this. Am thinking great deal about your problems abroad and here and will do my best to help bring about harmonious and satisfactory condition. Have suggested Menzies write you what I am contemplating suggesting be considered as soon as Baltimore audit completed end of this month to assist relieving London of guarantee. My best wishes to you and family. Seasons greetings. Duncan."

Menzies was the president of the Maryland Company. Subsequently on March 17, 1932, a letter was sent by Duncan to Goff explaining what was being done and inclosing a copy of a proposed letter to the stockholders outlining the plan of reorganization including the proposed consolidation with a request for criticisms and suggestions. The plan of consolidation seems to have been suggested by Baltimore counsel, and approved by Mr. Duncan in New York and the people in London. Briefly the plan was that the English Company would supply $200,000 capital to a new corporation to be organized which would consolidate with the Maryland Company and wipe out both. The English Company was to buy the Canadian Company for $300,000, and get a release of some $284,000 owing by the English Company to the Canadian Company, and a release from its guaranty as a result of the consolidation. The English Company was also to release its claim

against the Maryland Company for reimbursements for dividends it had paid out for the Maryland Company. This was all done. The plan was mechanically and legally perfect, each side gained something and gave up something, and as to those stockholders who assented to the reorganization, they were bound. Nearly all the stockholders assented. The Eastern Company was organized with $200,000 capital furnished by the English Company and all the stock was issued to a Mr. Matthews, the nominee of the English Company who came over from London to assist in the plan and also to act as a proxy. There were two other proxies, both Americans, a Mr. Legg and a Mr. Sayler. Only Matthews and Legg attended the meeting.

The English Company owned sixty per cent of the common stock of the Maryland Company, but only ten shares out of 50,000 shares of the preference stock which had been sold mostly to the American public. Under the Maryland law it was necessary that two-thirds of the stockholders of each class consent to the consolidation In other words, one-third of any one class of stockholders could block the proceeding. The English Company, therefore, could not carry through the plan alone, because it did not own two-thirds of either class of stock, but it could block the plan if it desired because it owned more than one-third of the common stock, and the plan could not go through without the active assistance and consent of the English Company. The English Company also, as above stated, owned all of the stock of the Eastern Company held in the name of its agent Matthews.

The precise point to be decided is whether the active participation of the English Company in the legal proceedings that brought about the dissolution of the Maryland Company will estop it from setting up said dissolution as a defense to plaintiff's claim.

The authorities are meager, in fact there is no exact precedent, and both sides rely on the same cases that abound in general statements and present both sides with points of argument. The following cases are cited: *Mason* v. *Standard Distilling Co.* (85 App. Div. 520); *Lorillard* v. *Clyde* (142 N. Y. 456); *Columbus Trust Co.* v. *Moshier* (51 Misc. 270; affd. on opinion below, 121 App. Div. 906; affd., without opinion, 193 N. Y. 660); *Stannard* v. *Reid & Co.* (114 App. Div. 135).

The first three of these cases were actions to enforce written agreements of guaranty of payment of dividends of third party corporations, the actions having been brought to enforce payment of dividends or the equivalent of dividends after the corporations had been dissolved. The fourth was an action to recover damages for breach of contract against a corporation which set up its own voluntary dissolution as a defense to the alleged breach of contract.

The *Mason* case was a question of pleading, going up to the Appellate Division on plaintiff's appeal from an order overruling his demurrer to defendant's two separate defenses in the answer. The first defense alleged the voluntary dissolution of the corporation whose dividends were guaranteed, and the consequent termination of the contract of guaranty of dividends. With the second defense we are not concerned.

The contract of guaranty in the *Mason* case was as follows: " For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby guarantees and agrees to pay to the holder of record of the within certificate, so long as said certificate shall be outstanding, but not to exceed the present unexpired term of the period for which said Spirits Distributing Company is incorporated, one and one-half per cent dividend on the 15th days of January, April, July and October, in each year beginning with the year 1899, on every share of first preferred stock of said Spirits Distributing Company represented by the within certificate."

The court said (at p. 524): " The primary question presented by the demurrer involves a construction of the contract of guaranty. By its express terms the defendant corporation undertook to pay the dividend provided for therein so long as the certificates to which such guaranty applied, should be outstanding, not, however, exceeding the unexpired term of the period for which the ' Spirits Distributing Company ' was organized. The contract contemplates the continued existence of the corporation. When the corporation was dissolved it ceased to be, and so ceasing to exist it could have no outstanding certificates of stock, except for the purpose of liquidation of the affairs of the corporation. It is evident that the defendant did not undertake to pay by the terms of its guaranty the dividend upon these shares of stock after the corporation had ceased to exist."

At page 526 the court discussed in a general way the point involved in the present case as follows: " The appellant, however, contends that although the ' Spirits Distributing Company ' is legally dead, yet that this contract survives for the reason that the defendant was the owner of a controlling interest with the ' Distilling Company,' and that it was also a controlling owner of the ' Distilling Company of America,' and was controlling the stock of the ' Spirits Distributing Company; ' that it procured the voluntary dissolution of such corporation and thereby by its own voluntary act it has relieved itself from the obligation imposed by the guaranty; that such being the fact, it is now estopped from averring as a defense

the dissolution of the ' Spirits Distributing Company;' that there fore the answer which seeks to make such dissolution available is opposed to equity and justice and should not be permitted.

" It is to be observed that the complaint in this action is predicated solely and entirely upon the terms of the guaranty. *The plaintiff cannot succeed in his action unless he is able to show that at the time when the action was brought this guaranty was in existence as a valid, subsisting contract, or so that the defendant is estopped from denying its existence.*

" If the act of the defendant and the ' Distilling Company of America ' in instituting the proceedings for the voluntary dissolution of the ' Spirits Distributing Company ' was conceived and carried out for the purpose of relieving the defendant from its obligation of guaranty, then such act and such scheme would amount in law to a fraud, and whatever damages the plaintiff sustained thereby he would undoubtedly have a cause of action."

Again (at p. 527) the court said: " If it should be made to appear, as it may, that the condition of the corporation was such as required its dissolution, or if facts existed which would have justified the action of the State in forcing it into involuntary dissolution, and the defendant was not responsible for such condition, acted without fraudulent intent, no cause of action would exist under this guaranty within the doctrine of the case above cited." (*People* v. *Globe Mutual Life Ins. Co.*, 91 N. Y. 174.)

At page 528: " If it appeared in this case that defendant worked this dissolution for the purpose of escaping liability under its contract, doubtless the plaintiff will have a good cause of action against it. The court, however, cannot determine such question upon demurrer, and the defendant under its answer may show that such was not the purpose."

We do not know the ultimate outcome of this litigation, but a similar case (*Bijur* v. *Standard Distilling & Distributing Co.*, 74 N. J. Eq. 546; 70 A. 934) arising out of the same corporate reorganization was tried in New Jersey and was decided in favor of defendant. That case was complicated by other issues that prevented a clear-cut decision on the question of whether a guarantor of dividends of a corporation that is dissolved or whose existence is otherwise terminated partly by the active assistance of the guarantor, is thereby relieved of the obligation of the guaranty. In the *Bijur* case (at p. 552) the court said: " But as to all of the objections to the dissolution of the distributing company, based on the alleged fraud of the Standard Company as one of the stockholders, acting through its own directors, I think the complainants are concluded by the bill and proceedings in their own suit in chancery above set

forth, in which they accepted the dissolution, took proceedings to carry it into effect and procured a final decree distributing its assets among all its stockholders, including as well the Standard and distributing company as themselves."

In construing the meaning of the guaranty the court laid stress on the use of the words " so long as said certificate shall be outstanding " as qualifying the meaning and term of the guaranty.

In *Lorillard* v. *Clyde* (*supra*) plaintiff and defendants were competitors in the shipping business. They united forces, organized a corporation with an equal division of stock and entered into a written agreement containing this provision: " William P. Clyde & Co. to have the management of said corporation and business, and in consideration thereof to guarantee to Jacob Lorillard a dividend of not less than seven per cent per annum for seven years, and to receive for such management the usual commission of two and one-half per cent in and five per cent out at each end of the freights earned."

In its opinion the Court of Appeals said: " The effect of the dissolution of the corporation upon the contract of guaranty as to payments subsequently accruing thereon presents the new question involved in the present litigation. Its solution rests primarily upon an interpretation of the contract."

Again (at p. 460): " The question whether the obligation of the defendants under their guaranty continued in force as to the part of the seven years, unexpired at the time of the dissolution of the corporation, in the absence of any responsible agency of either party for the causes which led to the dissolution, must be determined by the intention of the parties as ascertained from the language of the contract, and, if ambiguous, from such language and the surrounding circumstances. The contract contains no explicit statement on the subject."

After analyzing the intention of the parties the court concluded that there was an implied condition in the contract that it would last only during the life of the corporation.

" There is in the present case, we think, an element which strengthens the conclusion we have reached, that the obligation of the contract terminated *prima facie* with the dissolution of the corporation. There is something more than an implied and wholly unexpressed condition that the corporation should continue in life during the seven years. It is the fair construction of the language of the contract itself. The contract was not unilateral. It contains mutual stipulations. These mutual stipulations by their terms look to the continuance of the corporation, and the mutual obligations into which the parties entered are qualified by this understanding."

It will be observed that both in the *Mason* case and the *Lorillard* case the court held in construing the contracts of guaranty therein involved that there were elements of an express condition that the terms of the guaranty would not survive the death of the corporation. This prevented a clear cut decision that there is always implied in such a contract such a condition.

The plaintiff in the *Lorillard* case argued that defendant was estopped from setting up the dissolution of the corporation. On that point the court said: " The plaintiff, however, seeks to avoid the force of the proposition that, by the true construction of the contract, the obligation of the guaranty as to future payments did not survive the dissolution of the corporation, by the claim that the causes of the dissolution of the corporation were the wrongful acts of the defendants, and that they cannot interpose the judgment of dissolution brought about by their own misconduct as a defense. We think the answer to this claim is that, as between these parties and in this action, the plaintiff himself must be considered as having procured the dissolution of the corporation."

In *Columbus Trust Co.* v. *Moshier* (*supra*) the opinion does not contain a verbatim copy of the agreement of guaranty. The corporation whose dividends were guaranteed by defendant was dissolved in an action brought by the Attorney-General, on behalf of the People of the State. The court held that there was an implied condition in the contract of guaranty that it would terminate with the existence of the corporation. There was no element of estoppel against defendant in that case. On this point the court said: " There is no claim in this case that the defendant in this action was in any manner responsible for the acts which resulted in the judgment dissolving the corporation. He is not, therefore, estopped from claiming that his agreement has terminated."

The case of *Stannard* v. *Reid & Co.* (*supra*) did not involve any question of guaranty of dividends. It was an action for damages for breach of contract. Plaintiff was a building contractor who had a contract to construct a court house. He sublet a portion of the work to the defendant corporation. Before the time to commence the work under the subcontract had arrived defendant went into voluntary dissolution. Receivers were appointed, and the receivers disaffirmed the contract with plaintiff. The trial court dismissed the complaint on the ground that as a matter of law the dissolution of the corporation terminated the contract. The Appellate Division reversed and sent the case back for a new trial, saying in part: " This state of facts raises a fair presumption that the financial condition of the corporation did not make its dissolution *a necessity*, but rather that such dissolution was a temporary

expedient for the purpose of relieving it from an undesirable obligation. The mere proof on the part of the defendant that it had been voluntarily dissolved was not sufficient to relieve it from the obligations of its contracts. It was incumbent on it to go further, and to show that a dissolution was a necessity because of the financial condition of the corporation. This was not done, and hence the dismissal of the plaintiff's complaint was error."

A careful consideration of the above cited cases will make it appear that a contract of guaranty of dividends of a corporation, unless another intention appears from the contract, or the contract and surrounding circumstances, contemplates the continued existence of the corporation, and the continued existence of the shares of stock upon which dividends may be earned or declared; that if a corporation be dissolved by the State or any outside agency without any fault or connivance on the part of the guarantor, the contract of guaranty is at an end; that if such a corporation be dissolved by the action of the stockholder who is the beneficiary of the contract of guaranty of dividends, he is barred from seeking to recover his dividends; that if the termination of the existence of such a corporation is brought about by the guarantor himself for the sole purpose of relieving himself from liability under the guaranty, he is estopped from setting up as a defense in an action to enforce the guaranty the fact of the extinction of the corporation that he brought about himself, because that would be permitting him to profit by his own wrong. It seems clear also that even in a case where the guarantor himself brought about the termination of the corporation he will not be estopped from showing that fact in such an action, if it be made to appear that the termination was a necessity, and that he acted in good faith. There is an implication arising from the opinions in all these cases, although not decisively stated, that if a guarantor assists in bringing about the demise of a corporation whose dividends he has guaranteed, without showing any necessity for such demise, he will also be estopped from setting up such demise as a defense in an action on the contract of guaranty.

The steps taken in the consolidation proceedings in this case, so far as now appears, were legally and mechanically perfect. There is no active fraud shown in the form of any misstatement of fact, or concealment of fact, and after careful consideration I have come to the conclusion that the only argument that the plaintiff can sustain against the defendant is that defendant by its active participation and supervision in all stages of the legal moves between December, 1931, and June, 1932, assisted very substantially, and in fact played an essential part in bringing about the destruction

of the Maryland Company, and the inference is unavoidable that its primary purpose in these proceedings was to get rid of its burdensome guaranty.

Is this active participation sufficient to estop the defendant in its defense to this action? An analysis of the authorities above cited will show that none of them passes directly on this precise question.

In the present case I am of the opinion that the defendant has fallen short of showing any real necessity for the destruction of the Maryland Company. On the day it died another company having practically the same name was born to take its place and conduct precisely the same business, but without any guaranty of dividends attached to its stock certificates. The Canadian Company was a burden, but it has not been shown that the Canadian Company could not have been disposed of or wound up, thus relieving the Maryland Company of its burden without also at the same time destroying the Maryland Company.

When we consider the relations of the parties, the plaintiff's position is strengthened. He was not a virtual partner in the business as in the *Lorillard* case; he did nothing to indicate any assent to or approval of the consolidation proceedings, and did nothing to bar himself from relief as the plaintiffs had in both the *Bijur* and *Lorillard* cases.

The plaintiff was an investor who may be presumed to have been induced to buy stock in the Maryland Company in reliance on the strong and unequivocal guaranty of a successful and well-established corporation such as the defendant.

On the evidence submitted, guided by the principles enunciated in the cited authorities, I have come to the conclusion that the defendant, by its active intervention in the affairs of the Maryland Company, and particularly its material and quite essential assistance in bringing about the extinction of said company with the primary, if not the sole purpose of relieving itself of the burdensome guaranty, without showing any real necessity therefor, is estopped to deny the existence of the corporation and is liable to this plaintiff for the amount sued for.